IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

PETER T. CLINTON                                                              PLAINTIFF

V.                                                         CAUSE NO. 3:17-CV-00093-CWR-FKB

MISSISSIPPI DEPARTMENT OF
PUBLIC SAFETY
d/b/a MISSISSIPPI HIGHWAY PATROL                          DEFENDANT

## ORDER

This cause is before the Court on the Motion for Summary Judgment filed by the defendant, Mississippi Department of Public Safety ("MDPS"). Docket No. 27. Peter Clinton ("Clinton") filed this action alleging race discrimination and retaliation under Title VII of the Civil Rights Act of 1964. Docket No. 1, at 1. MDPS contends that no genuine dispute of material fact exists about MDPS's liability under Title VII for either race discrimination or retaliation. The Court disagrees. The motion, therefore, is denied.

**I.**      **Facts and Procedure**

Clinton was employed with MDPS from May of 1994 to November of 2015. Docket No. 31-1, at 10. Originally hired as a State Trooper under the Mississippi Highway Patrol branch ("MHP"),[1] Clinton moved up the ranks to Master Sergeant of the Mississippi Bureau of Investigation ("MBI") in August of 2006, to Lieutenant in 2013, *see* Docket No. 31-4, and to Captain of the Northern Region of MBI in December of 2014 after attaining the highest test score in the state. Docket No. 31-1, at 11; Docket No. 31-2, at 12; Docket No. 31-2, at 156.

---

[1] MHP is a branch of MDPS. MDPS consists of various divisions, including: 1) Highway Patrol; 2) Crime Stoppers; 3) the Crime Lab; 4) Homeland Security; 5) Bureau of Narcotics; 5) Law Enforcement Officer's Training Academy; 6) Bureau of Investigation, and several other divisions. *See* Docket No. 31-3, at 8-9.

1

In August of 2015, MBI Lieutenant Charles Hale[2] contacted Clinton about a voter fraud complaint he received stemming from a primary election for justice court judge in Tunica County, Mississippi. Docket No. 27-1, at 13-14. Clinton directed him to proceed with the investigation, but because Hale had never conducted such an investigation and was preparing to go on military leave, Hale asked for Clinton's assistance as he knew that Clinton worked on a voter fraud investigation in Tunica County for MBI in 2007. *Id.* at 14. After his conversation with Hale, Clinton spoke with Louise Linzy, one of the candidates, to discuss the voter fraud allegations in detail. *Id.* at 28.

On August 31, 2015, Clinton met with Major Jimmy Jordan ("Jordan")—Clinton's direct supervisor—and Lt. Colonel Larry Waggoner ("Waggoner").[3] *Id.* at 33. During the meeting, Jordan asked Clinton to cease the investigation and hand the case over to the attorney general's office. *Id.* at 34. He believed Clinton should have ceased the investigation because MBI had not investigated many voter fraud cases in the past, and at that time, MBI's resources would have been better used investigating murders and other major crimes. *Id.* Clinton complied with Jordan's request. *Id.*

Sometime in early September of 2015, Clinton went on military leave, at which point he received a phone call from Mildred Conley ("Conley"), Chair of the Tunica County Democratic Executive Committee ("DEC"), requesting Clinton's appearance at an upcoming hearing on the election dispute in Tunica County Circuit Court. *Id.* at 43. Once Clinton informed Conley that he

---

[2] Charles Hale was the District Lieutenant for the Northern region of MBI. *See* Docket No. 31-3, at 100-01. As district lieutenant, Hale reported directly to Clinton. *Id.* at 103; Docket No. 31-2, at 102.

[3] Serving MDPS for approximately twenty-eight years, Lt. Colonel Larry Waggoner, has been the director for MBI for over four years. *See* Docket No. 31-3, at 126. Major Jordan was the assistant to Waggoner. Docket No. 27-3, at 4-5. Waggoner, in turn, reported directly to Colonel Donnell Berry at all times relevant to this suit. Docket No. 31-3, at 126.

would not be able to attend the hearing because he was on military leave, Conley asked Clinton to turn over any notes he had from the investigation in order to prepare for the hearing. *Id.*

Clinton provided his notes to the parties and their counsel. Barbara Tuchel ("Tuchel"), the editor of a local blog "Transparency in Tunica" obtained a copy of the information and then contacted Clinton for permission to post the investigative report on her site. Docket No. 31-1, at 111-12; Docket No. 31-3, at 184. Clinton responded that he did not have the authority to tell her whether she could post the report if she obtained it through legal means, but he asked her to exclude any confidential information such as social security numbers and addresses. Docket No. 31-1, at 113; Docket No. 31-2, at 128-29. The parties dispute whether Clinton actually gave consent, but Tuchel posted a summary of the investigative report on her site. Docket No. 31-1, at 111-12; Docket No. 31-12; Docket No. 31-3, at 184.

In October of 2015, Jordan received a call from Ms. Tisha Burnett (a friend of Jacqueline Dishmon-Boykins, one of the candidates for Tunica County Justice Court Judge), wherein Ms. Burnett claimed Clinton was biased in conducting the investigation. Docket No. 31-2, at 48. Jordan forwarded the inquiry to Clinton and asked him to follow up with Ms. Burnett. Docket No. 31-1, at 63; Docket No. 31-2, at 28. After Clinton followed up with Ms. Burnett, he reported a summary of his conversation to Jordan, to which Jordan responded "Good report." Docket No. 31-14.

Less than a week later, Boykins filed a complaint against Clinton with the attorney general's office alleging bias in conducting the investigation. Docket No. 31-1, at 61-62. Having informed Clinton that he did not violate any departmental policies, Jordan asked Clinton to respond to the allegations in writing. Docket No. 31-2, at 133-34. After Clinton responded denying the allegations, the attorney general's office forwarded the complaint to MBI. Docket

No. 31-15. Waggoner also assured Clinton that he did not violate any departmental policies. Docket No. 31-2, at 136.

On October 27th, Clinton met with Jordan to discuss an ongoing investigation about a shooting on a college campus. Docket No. 31-1, at 134-35. During the meeting, a heated exchange ensued as Clinton complained about what he believed to be discriminatory conduct by Jordan. *Id.* at 134-36. More specifically, Clinton complained about Jordan's decision to remove Tim Douglas, a white officer, from Clinton's chain of command shortly after Clinton was promoted to Captain. Docket No. 31-19, at 2. That decision was the result of discrimination, Clinton claims. Clinton also mentioned a complaint he received from Phillip Patrick ("Patrick"),[4] an African-American subordinate officer, stating that Jordan instructed him to use all of his paid time off from work, even though he had 284 hours remaining. Docket No. 31-1, at 136. Clinton informed Jordan that he intended to file a discrimination complaint. *Id.*

On October 28th, Clinton e-mailed Jordan requesting that he send him a complaint form. Docket No. 31-17. Clinton also e-mailed Colonel Donnell Berry ("Berry")[5] requesting a meeting to discuss his complaints about Jordan. Docket No. 31-1, at 140-41; Docket No. 31-28. Later that day, MDPS's Internal Affairs ("IA") initiated an investigation on the complaint that Boykins had filed against Clinton. Clinton met with several IA investigators the next day. Docket No. 31-3, at

---

[4] Phillip Patrick was in the process of interviewing for a position in the Federal Bureau of Investigation (FBI) when Jordan instructed him to burn his paid time off from work. Docket No. 31-1, at 158-59. Clinton stated that Jordan was concerned about Patrick leaving MDPS to work for the FBI. *Id.* at 160. Clinton also stated that Patrick asked Clinton to find out whether forcing an employee to burn all of his paid time off was illegal under the Fair Labor Standards Act. *Id.* Clinton conceded in his deposition that he was not arguing that Jordan's instruction was racially motivated, but he mentioned it to provide context for the "heated discussion" he had with Jordan on October 27, 2015. *Id.* at 165.

[5] Colonel Donnell Berry, an African American, was the director of MHP for nearly five years until his retirement in 2016. As the second ranking officer on MDPS's chain of command, Berry reported to MDPS Commissioner Albert Santa Cruz at all times relevant to this suit. *See* Docket No. 31-3, at 8-9.

21; Docket No. 31-21. Three days later, on November 1st, Clinton e-mailed Berry a formal complaint against Jordan, alleging race discrimination. Docket No. 31-18.

On November 6th, Waggoner filed charges against Clinton for breach of departmental policies, including, *inter alia*,[6] insubordination, "engaging in prohibited activity", and "breach of Department security or confidentiality." Docket No. 31-3, at 26; Docket No. 31-23. Clinton appeared before the Performance Review Board ("PRB") on November 24th. Docket No. 31-24.

The PRB concluded that the charges for insubordination and "engaging in prohibited political activity" were unfounded, Docket No. 27-14, at 3-4, but concluded that Clinton violated MDPS's policy requiring officers to obtain permission from a superior before undertaking an investigation that was not a part of their regular duties. *Id.* at 3. The PRB did not make a determination on the "breach of Department security or confidentiality" charge. That same day, Berry sent a termination letter to Clinton, effective immediately. Docket No. 31-26.

Clinton later filed an appeal with the Employee Appeals Board ("EAB"). Docket No. 31-25. Conducting the hearings over the course of two days (April 20, 2016 and June 21, 2016), the EAB upheld the PRB's decision. Docket No. 31-2, at 1; Docket No. 31-3, at 1; Docket No. 27-3, at 25.

Clinton then filed a "Charge of Discrimination" with the Equal Employment Opportunity Commission ("EEOC") on December 18, 2015, alleging race discrimination and retaliation.

---

[6] The IA charges filed against Clinton included: (1) "Acts of conduct occurring on or off the job which are plainly related to job performance and are of such a nature that to continue the employee in the assigned position could constitute negligence in regard to the agency's duties to the public or to other state employees"; (2) "Engaging in prohibited political activity which is also in violation of Miss. Code Ann. § 45-3-11 and General Order 3.03.06 1.2.b."; (3) "A breach of Department security or confidentiality"; (4) "Insubordination, including but not limited to resisting management directives through actions and/or verbal exchange, and/or failure to follow supervisor's instructions, performed assigned work, or otherwise comply with applicable established written policy"; and (5) "Members will not undertake any investigation or other official action not part of their regular duties without obtaining permission from their superior officer, unless the exigencies of the situation require immediate police action." *See* Docket No. 27-13, at 1-2.

Docket No. 1-2. The EEOC issued a Notice of Right to Sue letter on August 15, 2016. Docket No. 1-3.

Clinton timely filed the instant lawsuit in this Court on February 10, 2017, based on his belief that Jordan, who is white, resented Clinton, an African American, and discriminated against him because of his race. *Id.* Furthermore, Clinton claims he was terminated because he complained about race discrimination. *Id.* In support of his contention, Clinton offers the following as evidence:

- Following the retirement of Major Jim Miller, before promoting Clinton to Captain, Jordan promoted Tim Douglas, a less qualified white male of lower rank, to Interim Captain of MBI's Northern Division. Docket No. 31-2, at 11-12. Clinton, who was Master Sergeant of MBI at the time and would have been eligible for Captain, believes Douglas's promotion was a political favor by Jordan to satisfy a debt owed to Douglas and several white MDPS officers for "their roles in protecting Jordan during a cheating scandal." Docket No. 1, at 2-3.
- Jordan removed Douglas from under Clinton's chain of command shortly after Clinton was promoted to Captain, which Clinton contends was a result of ongoing race discrimination by Jordan. Docket No. 31-19, at 2.
- MDPS initiated its IA investigation the same day Clinton told Jordan he planned to file a race discrimination complaint. Docket No. 31-3, at 21; Docket No. 31-21. Until his termination, in his twenty-one years with MDPS, Clinton had never been the subject of any other internal disciplinary action. Docket No. 31-1, at 100; Docket No. 2; Docket No. 31-3, at 11.

- Apparently, eighteen other officers — only two of whom are African American — who had previously been investigated for breach of department security or confidentiality received no punishment for their conduct. Docket No. 1-2, at 2. Clinton claims the charges against those officers arising from the cheating scandal were far more severe. In fact, the charges resulted from allegations that the officers obtained copies of promotion examinations prior to the exams. *Id.*
- Clinton was terminated and replaced by Kenneth Bailey, a white officer. Docket No. 1, at 3; Docket No. 31-27, at 5.

## II. Summary Judgment Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat summary judgment, a non-movant must identify admissible evidence in the record establishing a factual dispute. *Id.* at 56(c)(1). "Once a summary judgment motion is made and properly supported, the non-movant must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). A fact is considered "material" if its resolution could affect the ultimate disposition of the case. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).

A party seeking to avoid summary judgment cannot satisfy its burden by offering "conclusory allegations, speculation, or unsubstantiated assertions." *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002). Courts are required to draw all reasonable inferences in favor of the non-moving party. *Maddox v. Townsend & Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011).

### III. Clinton Properly Pleaded His Race Discrimination Claim

Title VII prohibits employers from "discharg[ing] an individual, or otherwise [sic] discriminat[ing] against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). The *McDonnell Douglas* burden-shifting framework applies to Title VII race discrimination claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a prima facie case of race discrimination, the plaintiff must show that he (1) is a member of a protected class, (2) was qualified for the position, (3) suffered an adverse employment action, and (4) was replaced by a non-member of his protected class. *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004). If the plaintiff meets this initial burden, the burden then shifts to the employer to "articulate a legitimate, non-discriminatory reason" for the adverse employment action. *Id.* If the employer satisfies this burden, the plaintiff must prove that the employer's purported justification is either false (and pretext for discrimination) or is true, but race discrimination was a motivating factor for the adverse employment action. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

As a preliminary matter, MDPS contends that Clinton waived his race discrimination claim because he did not plead it in his complaint. To effectively state a claim for race discrimination under Title VII, a plaintiff need only allege facts "concerning an adverse employment action that allegedly occurred because of the plaintiff's protected status." *Willis v. U.S. Postal Service*, 2015 WL 3638196, at *3 (E.D. Tex. June 9, 2015) (citing *Raj v. Louisiana State University*, 714 F.3d 322, 331 (5th Cir. 2013)). Thus, the mere failure to specifically allege race discrimination in the complaint is not fatal to Clinton's race discrimination claim, especially at the summary judgment stage. *See Denman v. Texas Dep't of Licensing and Regulation*, 2006 WL 504059, at *1 (W.D. Tex. Jan. 19, 2006) (Plaintiff did not waive her race discrimination

claim even though she did not allege race discrimination in the complaint and failed to check the "race" box on the EEOC complaint form.); *see also Hernandez v. City of Corpus Christi*, 820 F. Supp. 781, 795 (S.D. Tex. 2011) (quoting *Thomas v. Texas Dep't of Crim. Justice*, 220 F.3d 389, 395 (5th Cir. 2000) ("[t]he scope of a Title VII complaint is limited to the scope of the EEOC investigation which can *reasonably be expected to grow out of the charge of discrimination*.") (emphasis added)).

Here, unlike the plaintiffs in the aforementioned cases, Clinton did, in fact, check the "race" box on the EEOC charge. In addition, his Charge of Discrimination was clear. He "request[ed] the EEOC to investigate discrimination against me because of my race, and because I opposed discrimination . . . . My termination was the result of racial bias and discrimination." Docket No. 1-2. On that Charge, the EEOC issued its "Notice of Right to Sue" letter. Docket No. 1-3. In addition, the Court is also persuaded that the issue of race discrimination has been adequately litigated in this action. His series of race discrimination complaints, for example, is the underlying basis for his retaliation claim. Docket No. 1, at 2-3. Clinton's testimony from the EAB hearing directly supports his theory that race discrimination was, at least, a motivating factor for his termination. *See* Docket No. 31-2, at 155.[7]

The Court is satisfied that the claim of race discrimination has been pled and litigated.

### A. Clinton's Prima Facie Case

As for whether Clinton has made out a prima facie case of race discrimination, it is undisputed that Clinton is a member of a protected class as an African American, he was qualified for the Captain position, his termination constituted an adverse employment action, and he was replaced by Kenneth Bailey: a white officer. Docket No. 1, at 3. Therefore, Clinton has

---

[7] At the EAB hearing, as cited above, Clinton was asked "Can you think of any reason other than your race that he would have selected Tim Douglas over you?" Clinton responded, "Absolutely not. Nothing else."

made out a prima facie case of race discrimination. *See Hughes v. DynCorp Int'l, LLC*, 2016 WL 4191194, at *4 (N.D. Miss. Aug. 5, 2016) (African-American plaintiff who was qualified for her position, but was later terminated and replaced by a white female established a prima facie case of race discrimination under Title VII).

### B. MDPS's Legitimate, Non-Discriminatory Reason

MDPS maintains that its decision to terminate Clinton was legitimate and non-discriminatory because Clinton violated several departmental policies in conducting the voter fraud investigation. Docket No. 27-13. First, MDPS claims Clinton was insubordinate in continuing the investigation, even after Jordan ordered him to cease the investigation. *Id.* Secondly, MDPS claims it terminated Clinton because he broke protocol by providing his notes from the investigation to the justice court judge candidates and their attorneys before providing his notes to any of his superiors. Docket No. 27-15. MDPS particularly took exception to the fact that the investigation was still open and that Tuchel from "Transparency in Tunica" had seen the report before any of Clinton's superiors at MDPS. Docket No. 27-3. Finally, MDPS claims Clinton's investigation constituted "prohibited political activity." Docket No. 27-13.

A violation of departmental policies is sufficient to satisfy MDPS's burden of production. *See Cervantez v. KMGP Serv's Co. Inc.*, 349 Fed. Appx. 4, at *9 (5th Cir. Sept. 16, 2009) (violation of a company's computer-use policy constituted a legitimate, non-discriminatory reason for plaintiff's discharge under *McDonnell Douglas* framework). Now, the Court must determine whether Clinton has provided sufficient evidence of pretext.

### C. Clinton's Evidence of Pretext

At this stage, Clinton must produce evidence that MDPS's "proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Laxton v. Gap Inc.*, 333 F.3d 572, 578

(5th Cir. 2003). In doing so, Clinton "must rebut each nondiscriminatory reason articulated by the employer." *Id.* Clinton has met this burden of production.

In response to MDPS's allegation that he was insubordinate in continuing the investigation, Clinton emphasizes that he only continued to work on the investigation because Jordan asked him to respond to Boykins' complaint; Jordan also requested on multiple occasions status updates regarding the investigation. Docket No. 31-1, at 79. Moreover, Clinton states that he provided his notes to the parties and their counsel to allow them to prepare for the upcoming hearing. Docket No. 31-1, at 109. Finally, Clinton insists his involvement in the investigation was not "prohibited political activity" because he had investigated a voter fraud case in 2007.[8] Furthermore, he insists he did not need permission because he had the authority to "initiate investigations concerning any type of criminal activity" under state law.[9] Docket No. 31-3, at 13-14 and 165-67.

Perhaps, the best support for Clinton's pretext argument is that two of the initial charges from the IA investigation were determined to be *unfounded* by the PRB, but those same charges served as the foundation for Clinton's termination. Docket No. 31-24. More pointedly, in MDPS's Narrative Statement of Charges included in the termination later, MDPS cited the following as grounds for initiating the IA investigation:

> Acts of conduct occurring on or off the job which are plainly related to job performance and are of such a nature that to continue the employee in the assigned position could

---

[8] Clinton became involved in the 2007 voter fraud investigation as Master Sergeant of MBI after the Tunica County Sheriff contacted Alan Thompson, former Captain of MBI's Northern region, and asked MBI to assist in the investigation. When Thompson refused, former MBI Commissioner George Phillips instructed MBI to assist the sheriff's department in conducting the investigation. Docket No. 31-2, at 90-92 and 217-19.

[9] Clinton cited Miss. Code Ann. § 45-3-21 to support his argument that he did not need permission to pursue the voter fraud investigation. The relevant portion of the statute reads, "Investigators of the Bureau of Investigation of the Department of Public Safety shall have general police powers to enforce all the laws of the State of Mississippi." *See* In re: Hon. Laddie Huffman, 1990 WL 547865, at *1, n.1 (Miss. AG Op. June 8, 1990) (While Miss. Code Ann. § 45-3-21 "generally gives the Patrol the authority to patrol and enforce the traffic laws on the state highways and rights-of-way," subsection (b) ultimately vests investigators with general police power to enforce *all* laws.).

constitute negligence in regard to the agency's duties to the public or to other state employees;

Engaging in prohibited political activity which is also in violation of Miss. Code Ann. § 45-3-11 and General Order 3.03.06 [. . .]

A breach of Department security or confidentiality;

Insubordination, including but not limited to resisting management directives through actions and/or verbal exchange, and/or failure to follow supervisor's instructions, performed assigned work, or otherwise comply with applicable established written policy;

AND

Members will not undertake any investigation or other official action not part of their regular duties without obtaining permission from their superior officer unless the exigencies of the situation require immediate police action.

Docket No. 31-23. At the close of the proceedings, the PRB determined that the "engaging in prohibited activity" and insubordination charges were "unfounded." Docket No. 31-24. The PRB did not address whether Clinton breached Department security or confidentiality. *Id.* Oddly enough, insubordination, "engaging in prohibited political activity", and "breach of Department security or confidentiality" were all cited as grounds for Clinton's termination. Docket No. 31-15.

Construing all reasonable inferences in a light most favorable to the non-movant, Clinton has raised a genuine factual dispute as to whether MDPS's proffered legitimate, non-discriminatory reasons for Clinton's termination were a pretext for race discrimination.

**IV.    A Genuine Dispute of Material Fact Exists About MDPS's Retaliation Against Clinton**

The legal standard for Title VII retaliation claims essentially mirrors the burden-shifting framework for race discrimination claims. To make out a prima facie case of retaliation, the plaintiff must show that (1) he engaged in protected activity under Title VII, (2) he was subject

12

to an adverse employment action, and (3) that a causal link existed between the protected activity and the adverse employment action. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004) (citations and internal quotation marks omitted). If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* At that point, the burden shifts back to the plaintiff to prove that the employer's reason is pretext for retaliation. *Id.*

With regard to the first prong, Clinton argues that his complaints about Jordan's "discriminatory practices" constitute protected activity. In particular, Clinton claims he engaged in protected activity when he complained to Berry that Jordan was racially discriminatory in promoting Douglas to interim captain over Clinton,[10] when he complained to Jordan about removing Douglas from his chain of command, and when he sent a request for a complaint form to Jordan. Expressing complaints about race discrimination has long been recognized as protected activity under Title VII. *See Dixon v. Moore Wallace, Inc.*, 236 Fed. Appx. 936, 937 (5th Cir. 2007) (an employee engaged in protected activity under Title VII when she sent a letter to the human resources manager complaining of race discrimination). "An employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (quoting 42 U.S.C. § 2000e-3(a)). Thus, Clinton has satisfied the first prong.

---

[10] Clinton claims that Jordan promoted Douglas to Interim Captain over Clinton as a special favor "for not mentioning [Jordan's] name as one of the person[sic] that received unfair testing material". *See* Docket No. 31-19, at 1.

As stated above, it is undisputed that Clinton's termination constituted an adverse employment action. *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282-83 (5th Cir. 2004) ("It is beyond dispute that a termination causes an adverse employment action."). Since Clinton has satisfied the second prong, the Court must now consider whether Clinton has demonstrated a causal link between the protected activity and his termination.

To prove a causal link between engaging in protected Title VII activity and an adverse employment action, the evidence must indicate that the employer's adverse employment decision was "based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001) (citing *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998)). Clinton argues that the close timing between his complaints about race discrimination and the IA investigation is sufficient to prove a causal link.

"Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997); *see also Patterson v. St. Dominic-Jackson Mem. Hosp.*, No. 3:11-CV-623, 2013 WL 1149561, at *3 (S.D. Miss. March 19, 2013); *Brown v. Miss. Dept. of Health*, No. 3:11-CV-146-CWR-FKB, 2012 WL 1143846, at *4 (S.D. Miss. April 4, 2012) ("temporal proximity can be a relevant factor when addressing the issue of causation in a Title VII retaliation claim").

Here, Clinton has demonstrated a nexus of causality by identifying a number of events to support his race discrimination claim. For one, Clinton says he accused Jordan of race discrimination during their meeting on or about October 27th, 2015. Docket No. 31-1, at 134-36. During the meeting, Clinton complained about Jordan removing Douglas, a white officer, from

Clinton's chain of command just after promoting Clinton to Captain of MBI's Northern Division. *Id.* at 135-36. Clinton explained in his deposition:

> The other thing we talked about in his office was Tim Douglas, which was a lieutenant in MBI – and both of us were lieutenants in MBI at the time. And when I actually made captain, he moved Mr. Douglas, . . . a white male, from under my leadership and had him answering directly down here to this headquarters. So when we talked about that all that . . . it got a little heated . . .

*Id.* at 136. Additionally, Clinton complained of race discrimination in an e-mail to both Jordan and Berry on October 28th, and Clinton also requested a complaint form from Jordan. Docket No. 31-17. Berry initiated an IA investigation against Clinton that same day. Docket No. 31-3, at 21; Docket No. 31-21. Clinton's recollection of events presents a genuine dispute of whether conducting an internal investigation the next day after receiving a race discrimination complaint was the result of retaliation.

MDPS, on the other hand, contends that Clinton's claims are meritless, "conclusory allegations" because Clinton "can point to no documentary evidence" confirming that the meeting took place. Docket No. 28, at 17. While MDPS is correct in acknowledging that "conclusory allegations" will not suffice to defeat summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 247 (1986), MDPS's position, in this context, mischaracterizes each party's respective burden on summary judgment. The movant bears the burden of affirmatively proving the "absence of evidence" found in the record. *See Stotak v. Tenneco Resins, Inc.*, 959 F.2d 909, 913 (5th Cir. 1990) (citing *Celotex Corp. v. Catrett*, S. Ct. 2548, 2554 (1986)). In contrast, the non-movant need only point to disputed, material facts in the record. *See Stotak*, 959 F.2d at 913. In attempting to prove that a meeting took place between Clinton, Jordan, and Waggoner, Clinton's reliance on the sworn testimony, rather than formal, official documentation, does not amount to a conclusory allegation. *See Releford v. City of Houston*, 2016 WL 774552,

15

at *5 (S.D. Tex. Feb. 29, 2016) (deposition testimony contradicting moving party's version of facts was sufficient to deny summary judgment in §1983 action). Although MDPS may contest whether Clinton accused Jordan of race discrimination before the IA investigation, MDPS cannot contest that Clinton has shown a genuine dispute of material fact about whether he did so.

After considering the close timing of Clinton's protected activity and his termination, the fact that Clinton had not been subject to any other disciplinary actions in his twenty-one years with MDPS, and that Waggoner and Jordan had previously assured Clinton that he did not violate any departmental policies in conducting the voter fraud investigation, a reasonable jury could infer that Clinton complaining about race discrimination was at least in part a motivating factor for MDPS's decision to terminate Clinton.

Because Clinton has successfully presented a prima facie case of retaliation, there exists a genuine issue of material fact on whether he was terminated for complaining about race discrimination.

V. **Conclusion**

Based on the foregoing, MDPS's Motion for Summary Judgment is hereby DENIED. **SO ORDERED**, this the 23rd day of April, 2018.

s/ Carlton W. Reeves<br>
UNITED STATES DISTRICT JUDGE